JOHN G. HAMBLIN V. STATE OF NEBRASKA.

FILED MARCH 19, 1908.  No. 15,241.

1. **Criminal Law:** DEFENSE OF INSANITY: INSTRUCTIONS. In the trial of a person charged with the crime of murder in the first degree, the defense of insanity having been presented by the evidence, *held* not to be reversible error for the court to instruct the jury, among other things, that when the defendant has introduced evidence as to his mental condition sufficient to raise a doubt as to his sanity, which the law presumes, then it was incumbent upon the state to overcome such doubt, and to establish by evidence, beyond a reasonable doubt, that the defendant was sane at the time of the commission of the acts charged, as the instruction, when considered with others, did not place the burden of proving his insanity upon the accused.

2. ———: ———: ———. In a case where such facts claimed by the defense rendered the instruction applicable to them, it was not error for the court to instruct the jury that, if the accused was, at the time of the alleged criminal act, laboring under an aberration of mind to such a degree that he was unconscious of his acts, so much so that his intellectual powers were obliterated to that extent that he had no will, no purpose, no consciousness of right or wrong, he should be acquitted; the claim and testimony of the accused being that he was unconscious of his act, and had no recollection of the occurrence.

3. ———: ———. Instruction number 17, being a copy of instruction number 10 set out in *Carleton v. State*, 43 Neb. 373, 410, is approved, when considered in connection with the other instructions given.

4. **Homicide:** DEFENSES. Where a mortal wound is unlawfully inflicted by one person upon another under such circumstances that, if death had immediately ensued, it would have been a felonious

homicide, the fact that other causes, such as errors or accidents in the treatment of the victim, may have contributed to or hastened death, will not relieve the accused from the criminality of his act; the real cause of the death being the felonious assault.

5. Criminal Law: HYPOTHETICAL QUESTIONS. In propounding hypothetical questions to expert witnesses, it is allowable for each party to the controversy to submit such questions upon the theory of the case contended for by the side propounding them. A question is not improper simply because it includes only a part of the facts testified to. If facts are testified to which are not believed to be true, or which are believed to be immaterial to the issue, there is no rule of law requiring that they be included in the question.

6. ———: MISCONDUCT OF ATTORNEY: REVIEW. Where it is claimed that an attorney is guilty of misconduct in arguing a case to a jury, and it is desired to raise a question on that point for decision in the supreme court, it is necessary that objection be made to the trial court at the time, and an adverse ruling had thereon, and an exception thereto, and that the same be made a part of the record by a proper bill of exceptions.

7. ———: IMPEACHMENT OF VERDICT. Affidavits of jurors may not be received for the purpose of impeaching a verdict rendered by them, where the facts stated by the affidavits are such as inhere in the verdict, such as that the jury misunderstood or did not rightly comprehend the instructions of the court.

8. ———: INSTRUCTIONS. Where other instructions to the trial jury fully covered the law upon every feature of the case, including the law of insanity, reasonable doubt, etc., and an instruction is given covering the physical facts in the case, and stating that, if they are established beyond a reasonable doubt, the defendant would be guilty of murder or manslaughter "according to the evidence as explained in these instructions proves the one or the other," *held* not erroneous as withdrawing other questions and defenses from the jury.

9. ———: ———: SANITY OF ACCUSED: REVIEW. The question of the sanity of the accused having depended upon conflicting evidence submitted to the jury, under proper instructions, the verdict of the jury must be taken as decisive of the question, so far as the reversal of the judgment is concerned.

10. ———: ———. While not always calling for a reversal of a judgment, the incorporation of sayings of law writers, not containing statements of legal principles, into instructions, cannot be approved.

11. ———: NEW TRIAL. "It is a general rule, applicable in capital
    as well as in other cases, that a new trial will not be granted
    on the ground of newly discovered evidence where such evidence
    would be cumulative merely." *St. Louis v. State*, 8 Neb. 405.

ERROR to the district court for Hall county: JAMES N.
PAUL, JUDGE. *Affirmed. Sentence reduced.*

*Leo Cleary, B. H. Paine* and *W. H. Thompson*, for
plaintiff in error.

*W. T. Thompson, Attorney General, Grant G. Martin,
A. C. Mayer* and *W. A. Prince, contra.*

REESE, J.

On the 17th day of January, 1907, an information was
filed in the district court for Hall county, accusing plain-
tiff in error of murder in the first degree by shooting
Rachael Engle on the 3d day of August, 1906; the allega-
tions of the information being that the deceased lived
until the 14th day of January, 1907, when she died from
the effects of the gun-shot wound. Upon a plea of not
guilty being entered, a trial was had, which resulted in a
verdict of guilty of murder in the first degree and the im-
position of the death penalty. A motion for a new trial
was filed, which was overruled, and the sentence fixed by
the jury was pronounced. The case is brought to this
court for review by proceedings in error.

In so far as the physical facts of the alleged tragedy are
concerned, there does not appear much, if any, dispute or
conflict. For the purposes of this investigation, it may
be stated that plaintiff in error on the 3d day of August,
1906, was an unmarried man of about 33 years of age, and
Rachael Engle was a girl, or young woman, of between 15
and 16 years of age, in good health and rather a robust
constitution, of medium size and unmarried. She resided
with her mother and stepfather, Mrs. and Mr. Kent, whose
home was in Grand Island. Plaintiff in error was a

laborer, employed by Mr. Kent, and made his home with the family, with whom he had boarded for some 11 months, though not all of that time employed by Mr. Kent. At the time of the alleged assault a street carnival was being carried on in that city. After supper on the evening in question the family, consisting of Mr. and Mrs. Kent, their daughter, Rachael Engle, their son, George Engle, Charles Smith, Stephen Williams and plaintiff in error, together with Mr. and Mrs. Greenfield and their daughter, Miss Dunham, who were visiting the Kents for the evening, decided to go upon the streets and witness the carnival. The younger people, consisting of Miss Engle, Miss Dunham, Mr. Engle, Mr. Smith, Mr. Williams and plaintiff in error, started to walk, while the Kents and Greenfields rode in a spring wagon or carriage. The young people pursued their course toward the central portion of the city. Smith, George and Rachael Engle, and Miss Dunham, becoming somewhat separated from plaintiff in error and Williams, were enjoying themselves by indulging in the innocent frolics of the evening, while plaintiff in error and Williams walked rather to themselves. As they crossed the railroad tracks on their way they passed a car standing near the sidewalk, when plaintiff in error stepped behind the car and struck a match, presumably for the purpose of lighting his cigar. At or about that time Smith and Rachael Engle passed by, when plaintiff in error shot Miss Engle, the ball entering the back in the region of the eighth or ninth dorsal vertebra, penetrating the spinal column, severing the spinal cord, and becoming buried and lodged in the anterior portion of the bone. This wound produced immediate, total and permanent paralysis of the whole of that portion of the body below it, and Miss Engle fell helpless to the ground. Plaintiff in error fired another shot with no effect, except that the powder struck the face of Smith, who was standing by where Miss Engle fell. Whether this shot was fired at Smith or not is a matter of conjecture, but it was evidently not fired at Miss Engle. Plaintiff in error started to run

away. Smith, at or about the same instant, cursing him, calling him a bad name, and saying he would kill him, pursued him for a short distance, when he (Smith) returned to Miss Engle. This occurred at about the hour of half past 8, or a little before dark. Miss Engle was taken to a hospital, the wound examined, and she was made as comfortable as possible for the night. The surgeons, not being able to definitely locate the ball without making an incision, applied the X-ray, by which the location of the ball was determined, and an effort was made to extract it by enlarging the wound and chipping off and removing the fractured bones. It was discovered that the ball had passed through the spinal cord, completely severing it, and had become embedded in the bones of the inner portion of the spinal column. As the ball could do no further harm, it was permitted to remain. The wound healed up, and, except as to the paralysis of the lower parts of the body, gave but little trouble. The vital organs performed their functions naturally, food was taken and digested, but the intestines and bladder being rendered inactive, it was necessary that evacuations should be produced by artificial means. The bladder was relieved by the insertion of a glass catheter two or three times each day. After the healing of the wound in the back the victim suffered little, if any, pain. About the beginning of December, 1906, while an attendant was using the catheter, it was, by accident, broken in two, and the severed end, about 2½ inches long, remained in the bladder. This was allowed to remain for some time, probably eight or ten days, when it was removed by an operation which consisted of making an incision through the wall of the body and in the bladder. At that time bed sores had appeared upon the body; some of them having become gangrenous and the flesh sloughing off; others showing the discoloration caused by ecchymosis. The wound made in removing the broken catheter never healed, and soon thereafter the victim began to fail rapidly, and died on the date above named, to wit, January 14, 1907.

Upon the trial two lines of defense were developed: One that plaintiff in error was insane at the time of firing the shot; and the other that the victim died, not from the effects of the wound caused by the ball, but that the cause of her death was the accident in breaking the catheter and allowing it to remain in the body until inflammation and gangrene were developed to such an extent as to cause the death. In other words, that a new and independent cause, itself producing the death, intervened. Other questions were presented upon the trial and in the motion for a new trial and they are here upon the record; but to a great extent the case hinges upon these two.

As to the former, there was evidence to the effect that plaintiff in error was an epileptic; that he had suffered sunstroke on a number of occasions; that he had suffered excruciating pains in his head during the most of his adult life; that he was frequently unconscious of his acts; that when suffering from his paroxysms his memory was obliterated, and he testified that he had no knowledge or recollection of firing the shot which inflicted the wound on Miss Engle. It was also claimed that there was no motive shown for the act, the parties being on friendly terms, and that there was no attachment between them, or jealousy on his part; they never having associated together except as members of the same household. A number of credible witnesses, both expert and nonexpert, testified that in their opinion he was not able to distinguish the difference between right and wrong, nor was he able to judge of the particular act at the time of firing the shot. Evidence was also introduced by the state by which it was sought to establish his sanity. This consisted of the testimony of witnesses who had associated with him, and also of experts.

Complaint is made of certain instructions given by the court to the jury upon this feature of the case, among which are instructions numbered 22 and 26, which are as follows: Instruction number twenty-two: "You are instructed that when the defendant has introduced evidence

as to his mental condition sufficient to raise in your minds a doubt as to the sanity of the defendant at the time of the commission of the alleged offense, which the law presumes, then it is incumbent upon the state to overcome, by evidence, such doubt, and to establish, by evidence, beyond a reasonable doubt, that the defendant was sane at the time of the commission of the acts charged." Instruction number twenty-six: "You are instructed that in criminal prosecutions the burden of proof never shifts, but, as to all defenses which the evidence tends to establish, rests upon the state throughout; hence, a conviction can be had only when the jury are satisfied from a consideration of all the evidence of the defendant's guilt beyond a reasonable doubt. This rule applies not alone to the case as made by the state, but to any distinct, substantive defense which may be interposed by the accused to justify or excuse the act charged." The criticism upon the instruction numbered 22 is that by it the jury are told, in effect, that the presumption is that plaintiff in error was sane at the time of the commission of the act, but that, if *he* "has introduced evidence as to his mental condition sufficient" to raise in the minds of the jury a reasonable doubt of his sanity at the time of the commission of the act, he should be acquitted—stated differently, that the jury would necessarily infer from the language used that the burden was upon the defendant, in the first instance, to rebut the presumption of sanity sufficient to raise a doubt thereof in the minds of the jury, and that then the burden would change or shift to the state to prove beyond a reasonable doubt the sanity of the accused. This criticism is, in a sense at least, a just one, but we cannot say, in the light of *Knights v. State,* 58 Neb. 225, and *Furst v. State,* 31 Neb. 403, that the instruction was radically wrong and misstated the law. If the language of the instruction could have made a wrong impression upon the minds of the jury by what might be claimed as an unfortunate expression, that impression would be removed by the twenty-sixth instruction, which informed them that

the burden of proof never shifts, but as to all defenses which the evidence tends to establish rests with the state throughout. As these instructions must be construed together, we are unable to find error to the prejudice of plaintiff in error. This must dispose of the contention that these instructions were contradictory, inconsistent, or irreconcilable.

Instruction numbered 20 is complained of, which is as follows: "You are instructed that the defendant in this case interposes the defense of insanity, or an aberration of the mind claimed to arise from overheating or sunstroke or epilepsy. Such a defense is a legal and proper one, one recognized by the law, and the evidence relating thereto should be viewed by the jury and weighed the same as any other evidence should be which tends to establish any other defense known to and recognized by the law. If the accused in this case was at the time of the act charged laboring under an aberration of the mind to such a degree that he was unconscious of his acts, so much so that his intellectual powers were obliterated to that extent that he had no will, no purpose, no consciousness of right or wrong in respect to the particular act charged, then a great wrong would be done him to find him guilty of the offense charged; on the other hand, if he had will, purpose, intelligence, consciousness of right and wrong in respect to the particular act charged, and such is established by the evidence, as well as his guilt of the offense charged, then you would be doing an injustice to society and to law to permit him to escape punishment for his wrongful acts so committed." The criticism of this instruction is of the words: "If the accused in this case was at the time of the act charged laboring under an aberration of the mind to such a degree that he was unconscious of his acts, so much so that his intellectual powers were obliterated to that extent that he had no will, no purpose, no consciousness of right or wrong in respect to the particular act charged, then a great wrong would be done him to find him guilty of the offense charged; on

the other hand, if he had will, purpose, intelligence, con-
sciousness of right and wrong in respect to the particular
act charged, and such is established by the evidence, as
well as his guilt of the offense charged, then you would
be doing an injustice to society and to law to permit him
to escape punishment for his wrongful acts so committed."
It is contended that under this instruction, in order to
acquit the defendant, it would be necessary for the jury
to find that the accused was laboring under a mental aber-
ration to such an extent that he was unconscious of his
acts, *and* that his intellectual powers were obliterated to
that extent that he had no will, *and* no purpose, *and* no
consciousness of right or wrong.   There is no doubt but
that the part of the instruction referred to, if considered
in the abstract, would be open to the criticism made, and
would be erroneous in a case where general insanity was
claimed.   However, we cannot see that the instruction
was wrong when we consider the evidence.   It must be
remembered that plaintiff in error in his testimony denied
all knowledge or recollection of what occurred at the time
of the shooting.   If his testimony is true, and for this pur-
pose we must assume that it is, his mind was a total and
absolute blank, at least so far as memory was concerned,
at the time of the tragedy.   He had neither consciousness,
nor will, nor purpose, nor appreciation of the distinction
between right and wrong.   This part of the instruction
was doubtless given with reference to that testimony, and
we cannot say that it should not have been given.   The
closing portion of this instruction, containing the admoni-
tion that, if plaintiff in error possessed the mental facul-
ties spoken of, the jury "would be doing an injustice to
society and to law to permit him to escape punishment for
his wrongful acts so committed," was unnecessary, and
added no principle of law to that which had gone before,
and it is not to be presumed that the jury stood in need
of this cautionary expression.   While we are unable to
see that plaintiff in error was prejudiced thereby, yet
such sentences in instructions should not be indulged in.

Complaint is made of the giving of the seventeenth instruction, which we here copy: "The jury are instructed that, while the law requires, in order to constitute murder in the first degree, that the killing shall be done purposely and of deliberate and premeditated malice, still it does not require that the premeditation and deliberation, or the wilful intent and purpose, shall exist for any length of time before the crime is committed. It is sufficient if there was such design and determination to kill distinctly formed in the mind at any moment before or at the time the blow is struck or the fatal shot is fired; and in this case, if the jury believe from the evidence beyond a reasonable doubt that the defendant feloniously, purposely, and of his deliberate and premeditated malice, shot and killed Rachael Engle in manner and form as charged in the information, and that before or at the time the said shot was fired the defendant had formed in his mind a wilful, malicious, deliberate and premeditated design or purpose to take the life of the deceased, and that the shot was fired in furtherance of that design or purpose, and without any justifiable cause or legal excuse therefor, then the jury should find the defendant guilty of murder in the first degree. To constitute murder in the first degree there must have been an unlawful killing of a person, done purposely and with deliberate and premeditated malice. If the person has actually formed the purpose maliciously to kill, and has deliberated and premeditated upon it before he performs the act, and then performs it, he is guilty of murder in the first degree, however short the time may have been between the time of forming the purpose and the time of its execution. It is not the length of time intervening between the time of the formation of the purpose and the time of the actual killing which constitutes the distinctive difference between murder in the first degree and in the second degree. An unlawful killing done purposely and with deliberate and premeditated malice constitutes the crime of murder in the first degree, while murder in the second degree consists in an

unlawful killing done purposely and maliciously, but without deliberation and premeditation. To constitute murder in the first degree, it matters not how short the time may be between the time of the formation of the purpose to kill and its execution, if the party has turned it over in his mind, that is, weighed and deliberated upon it." This instruction is copied from an instruction given in the case of *Carleton v. State*, 43 Neb. 373, 412. The language used was criticised by us, and it was said that "this language, if it stood alone, might be ambiguous and objectionable, as possibly implying that it would be murder in the first degree if the intent were formed simultaneously with the infliction of the wound; but by the latter portion of the instruction it clearly appears that the intent must have been formed, and that there must have been deliberation and premeditation before the act was performed, and also that there must have been a turning over in the mind, a 'weighing and deliberation.' And by the twelfth instruction it was stated, 'If an intention to kill exists, it is wilful; if this intention be accomplished by such circumstances as evidence a mind fully conscious of its purpose and design, it is deliberate. Premeditate means to think of in advance; to determine upon beforehand. It means that there was a design to kill before the act of killing took place.'" This twelfth instruction was not given in terms in this case. Why it was omitted we need not inquire. While we are not convinced that it was necessary, yet, if the substance of it were given in any other instruction, the evil, if any existed, would be cured. The last paragraph of this instruction is copied substantially from an instruction given in *Reed v. State*, 75 Neb. 509, and which was approved. In instruction numbered 15 the court instructed the jury: "'Deliberation' means the act of deliberating or weighing and considering the reasons for or against a choice or measure. In the sense in which the word is here used an act is done deliberately or with deliberation when it is done in cool blood, and not under the influence of vio-

lent passion, suddenly aroused by some real or supposed grievance. A person who does an act, not in the heat of sudden passion, but after having coolly weighed or considered the mode and means of its accomplishment, does it deliberately." Instruction numbered 16 is as follows: "Upon the question of 'intent' you are instructed that the law presumes a man to intend the reasonable, probable and natural consequences of any act, by him voluntarily and intentionally done, and this presumption will always prevail unless, from a consideration of all the evidence bearing upon this point, the jury entertain a reasonable doubt whether such intent did exist." The court also gave the legal definition of malice in the fourteenth instruction, but there is no separate instruction defining or giving the meaning of the word "premeditation." However, this seems to be fully covered by the instruction above quoted, as well as incidentally in other instructions.

Instruction numbered 23 is sharply criticised by counsel for plaintiff in error. It here follows: "You are instructed that the rule that death must result within a year and a day is one of limitation only, and does not change the burden of proof; but the state must prove beyond a reasonable doubt that the deceased died of the wound inflicted by the defendant, but this general rule requires explanation in its application to certain conditions disclosed by evidence in this case; that a person who has inflicted a mortal or dangerous wound with a deadly weapon upon the person of another cannot escape punishment by proving that other causes may have cooperated in hastening or producing the fatal result." It is contended that the latter portion, beginning with the words, "but this general rule requires explanation," etc., should not have been given; that there is no "explanation" which sheds any light upon the rule, but that the so-called "explanation" is harmful, for the reason that it contains the statement, without any reference to the "general rule," that a "person who has inflicted a mortal

or dangerous wound with a deadly weapon upon the person of another cannot escape punishment by proving that other causes may have co-operated in hastening or producing death." It is difficult for us to see just why that portion of the instruction should have been given in the connection in which it occurs. It is probably a correct statement of the law upon that particular subject, but what light can be thrown by it upon the preceding portion of the instruction is not clear. However, we do not see that any prejudice to the rights of plaintiff in error resulted from the language used. While it is true that, if death from a wound unlawfully inflicted does not follow within a year and a day, the presumption is that the death was from another cause, yet, as the victim .died within less than six months after receiving the injury, any discussion of what might have happened but for the unfortunate accident of breaking the catheter must necessarily be purely speculative, and not a necessary inquiry in this case.

It is also contended that the real, immediate cause of the death of Rachael Engle was the breaking and lodging of a portion of the catheter within the bladder and allowing it to remain there for so great a length of time, followed by the operation for its removal, and that the jury should have so found under the evidence. This question was passed upon by the jury under instructions, and by their verdict they found against plaintiff in error. There was sufficient evidence to show that the gunshot wound was · a mortal one, and that there was no escape from death therefrom, but that the exact time which the patient would live could not be stated. The lower portion of the body being paralyzed, a steady and continuous degeneration would follow, owing to the failure of nerve force and circulation, and recovery was impossible. At the time of the accident portions of the body had already sloughed off, and ecchymosis was visible in many places. This being true, the fact that the accident, and probably subsequent unskilful treatment, may have contributed to

and even hastened death would not relieve the accused from the criminality of his act, if it were criminal. This rule seems to be quite well settled. The rule is also well settled that, if a new and independent cause of death intervenes and of itself takes the life of one mortally wounded, it will be considered the cause of the death, and the person inflicting the first wound could not be held accountable for the murder, however subject he might be to a prosecution for the felonious assault. But, as in a case of this kind, when the wound inflicted was mortal or dangerous and directly contributed to the death, the first wrongdoer will not be absolved from accountability for his act. Wharton, Homicide (3d ed.), sec. 35 *et seq.;* 2 Bishop, Criminal Law (7th ed.), sec. 638; *Denman v. State,* 15 Neb. 138; *Territory v. Yee Dan,* 7 N. M. 439; *State v. Edgerton,* 100 Ia. 63; *Downing v. State,* 114 Ga. 30; *Clark v. Commonwealth,* 90 Va. 360; *Daughdrill v. State,* 113 Ala. 7; *Sharp v. State,* 51 Ark. 147; *State v. Wood,* 112 Ia. 411.

During the course of the trial hypothetical questions were propounded to the expert witnesses by both the prosecution and defense. Those propounded by the prosecution were much shorter and omitted many elements contained in those submitted by the defense, some of which were included in the evidence. Objections were made to those submitted by the prosecution upon the ground that they failed to include all the facts shown by the testimony. The objection was overruled, to which plaintiff in error excepted, and now assigns the ruling as error. The questions were quite lengthy, and it could serve no good purpose to reproduce them here. It must be sufficient to say that, as we understand the rule, it is allowable for each party to a controversy to submit hypothetical questions upon the theory of the case contended for by the side propounding the question. If any facts are testified to which are not believed to be true, or which are believed to be immaterial to the issue, we know of no

rule which would require them to be incorporated in the question. Of course, the omission of any facts appearing in the case would be at the peril of the side propounding the question and subject to the consideration of the jury, and, if the questions were manifestly unfair, a jury of even ordinary intelligence would know of the omission and might reject the answer of the witness. In Rogers, Expert Testimony (2d ed.), sec. 27, it is said: "Counsel, in framing the hypothetical question, may base it upon the hypothesis of the truth of all the evidence, or on an hypothesis especially framed on certain facts assumed to be proved for the purpose of the inquiry. The question is not improper simply because it includes only a part of the facts in evidence. And if framed on the assumption of certain facts, counsel may assume the facts in accordance with his theory of them, it not being essential that he should state the facts as they actually exist. 'The claim is,' says Chief Justice Folger, 'that a hypothetical question may not be put to an expert, unless it states the facts as they exist. It is manifest, if this is the rule, that in a trial where there is a dispute as to the facts, which can be settled only by the jury, there would be no room for a hypothetical question. The very meaning of the word is that it supposes, assumes something for the time being. Each side, in an issue of fact, has its theory of what is the true state of the facts, and assumes that it can prove it to be so to the satisfaction of the jury, and so assuming, shapes hypothetical questions to experts accordingly. And such is the correct practice.'" See, also, *Herpolsheimer v. Funke,* 1 Neb. (Unof.) 471; *Schulz v. Modisett,* 2 Neb. (Unof.) 138. Then, again, had plaintiff in error desired to do so, he could have taken the opinion of witnesses for the prosecution on a question propounded by himself, or even submitted the one propounded to his own experts, and, receiving a favorable answer, thus showing his insanity by witnesses on behalf of the state.

A reversal of the judgment is asked for on account of the misconduct of one of the attorneys for the state in the

use of improper language in making the closing argument. The subject appears to have been first presented for a ruling by the trial court in an affidavit in support of the motion for a new trial. It is true that the affidavit sets out the language complained of, and that objection was made at the time, but there is no record anywhere of an adverse ruling and exception, both of which were necessary in order to secure a review of the subject. In discussing a similar question in *Cropsey v. Averill,* 8 Neb. 151, 160, the rule of procedure was stated by Judge LAKE, and has been considered as the proper one ever since, so far as we know. It is said: "To have raised a question on this point for this court to decide there needed to be an adverse ruling of the court below, and an exception thereto, and these should have been made a part of the record by a proper bill of exceptions." While this rule precludes us from reversing the judgment upon this ground, we have examined the affidavit of the attorneys for plaintiff in error, and the counter affidavit of the attorney against whom the charge was made, and are unable to see that the rules of proper and legitimate discussion were violated.

It is claimed that the jury were guilty of misconduct while deliberating upon the verdict. The affidavits of four jurors were produced and submitted to the trial court upon the hearing of the motion for a new trial. Of these, three testified that, when the subject of the insanity of plaintiff in error was called up for consideration, objection was made to any deliberation upon that subject as that whole matter had been withdrawn from the jury by the instructions of the court, and that the jury so decided and that subject was not considered, debated nor determined by the jury. No counter affidavits were filed. The first question to be considered in connection with this subject is to what extent may the affidavits of jurors be received for the purpose of impeaching their verdict? The rule of law upon this subject appears to be well settled, both in this and other states of the Union, and there

seems to be an entire unanimity of holdings. In 2 Thompson, Trials, section 2618, it is said: "Upon the grounds of public policy, courts have almost universally agreed upon the rule that no affidavit, deposition, or other sworn statement of a juror will be received to impeach the verdict, to explain it, to show on what grounds it was rendered, or to show a mistake in it; or that they misunderstand the charge of the court; or that they otherwise mistook the law, or the result of their finding." See, also, *Harris v. State,* 24 Neb. 803; *Coil v. State,* 62 Neb. 15; *Savary v. State,* 62 Neb. 166. If the instructions correctly stated the law, the fact that the jury failed to understand or misinterpreted them cannot be shown by their affidavits. The affidavits are to the effect that the jury understood and believed that by instruction numbered 24, the whole question of the sanity of plaintiff in error was withdrawn from their consideration, and that the accused, under the facts proved, was guilty of murder or manslaughter, according to the evidence, and that they must so find. The giving of the instruction was duly excepted to, and is here assigned for error. If it was correctly given, the verdict cannot be impeached upon the ground that it was not correctly understood. If incorrect, the error would be in giving the instruction. It is here copied: "And you are further instructed that, if you are satisfied beyond a reasonable doubt that the defendant inflicted on the deceased a dangerous wound with a deadly weapon, and that said wound produced a condition in said deceased that required the use of a catheter, and that in its use it was broken, a part remaining in the bladder of the deceased which required a surgical operation to remove it, and that the piece of catheter, while in the bladder, and the operation to remove it, together with the condition of the deceased as produced by the wound inflicted by the defendant, caused gangrene and fever to ensue, and that the deceased died from the wound inflicted by the defendant, combined with the conditions produced by the broken catheter and the operation to remove it, then the defend-

ant is guilty of murder or manslaughter according to the evidence as explained in these instructions proves the one or the other. The law does not permit a person who has used a deadly weapon and with it inflicted a dangerous wound upon another to apportion his own wrongful act and divide the responsibility of it by speculating upon the question of the extent to which other causes may have co-operated in, or contributed to, the death of the person injured." If there is any real vice in this instruction, it is that, by its language, the jury may have concluded, as they seem to have done, that the question of the mental condition of plaintiff in error was eliminated from the case, and that, if they found beyond a reasonable doubt that he inflicted the wound, and that the condition of the deceased, as produced by the wound, caused the gangrene to follow the breaking of the catheter and the operation to remove it, then plaintiff in error "is guilty of murder or manslaughter according to the evidence as explained in these instructions proves the one or the other." If this instruction stood alone, we would have no hesitation in saying that it should not have been given in the form in which it occurs. The closing words of the first paragraph that the defendant is guilty of "the one or the other," meaning murder or manslaughter, would also be open to criticism. But this is followed by instruction No. 25, which is as follows: "You are further instructed that, if you are in doubt whether the wound was mortal, or a dangerous wound, or whether it caused or contributed to the death, or whether the deceased might not have died from the effects of the broken catheter in the bladder and the operation to remove it alone, then the defendant will be entitled to an acquittal." Reading the two instructions together, it cannot be said that the effect was to instruct the jury that they must find the defendant guilty of murder or manslaughter, "the one or the other." Under the rule, all instructions given must be construed together, and, since there is no conflict or inconsistency in the charge taken as a whole, and all may be harmonized, we

do not see that instruction No. 24 could by any reasonable interpretation mislead the jury and produce the conviction upon their minds that the question of the sanity of plaintiff in error was not to be considered. The closing paragraph of the instructions is, we think, justly criticised, yet it is not fatally erroneous. It is not every correct statement of the law found in law books or argumentative legal discussions that is or would be considered desirable in an instruction to a trial jury. The sayings of law writers, no matter how "fitly spoken," should not, as a general rule, be made use of as embellishments when juries are being instructed. The instruction under consideration was complete as a legal proposition without this additional paragraph. True, it probably did no harm and resulted in no prejudice to plaintiff in error, yet its use as a necessary part of the instruction is not apparent.

It is contended that the verdict of the jury is not supported by sufficient evidence. We assume that this contention does not question the fact of the alleged shooting of the deceased at the time, place, and under the circumstances charged in the information and detailed by the witnesses, nor the fact of her subsequent death, nor can the fact that the gunshot wound contributed to her death be seriously questioned. For the purpose of this inquiry, we will assume that the foregoing are not to be here considered. Considerable of evidence was submitted tending to prove the insanity of plaintiff in error at the time of the shooting of Miss Engle. In support of this contention of insanity, it is insisted that there was an absolute absence of malice, unless the mere fact of the shooting demonstrated its presence; that there was nothing shown in the evidence tending to prove the existence of any motive for the act; that there was no evidence of attachment, envy or jealousy; that plaintiff in error, being a member of the Kent family for so long a time, had never shown any preference for the deceased, nor that she had ever shown any dislike for him; that during a great portion of his life he had been subject to attacks of epilepsy, and had

on a number of occasions been subjected to sunstroke when laboring in warm weather, and which had resulted in long continued prostrations; that he had all his later life been subject to attacks of intense pains in his head; that his epileptic attacks had produced temporary unconsciousness; that he was unconscious of what he did at the time of the shooting, and was irresponsible for his act. The testimony tending to present this defense cannot be here set out without extending this opinion to an unreasonable length, and without any compensating benefits. Expert witnesses, prominent in the medical profession in this state, in answer to counsel's hypothetical question, and after slight personal examination of plaintiff in error, testified that in their opinion he was not sane at the time of the tragedy. There was enough testimony of the character above suggested which, uncontradicted, would have been sufficient to justify a verdict of acquittal. But testimony was produced by the state maintaining the opposite, and, this conflict being submitted to the jury, it was for them to decide, and with their decision we must be content, in so far as a reversal of the judgment is concerned.

A number of affidavits of persons who had known plaintiff in error during his earlier life were filed in support of the motion for a new trial, and in which many facts were stated which would tend to support the defense of insanity, but those statements of fact were cumulative upon those presented to the jury upon the trial. While much, and probably all, of what is stated in those affidavits would have been competent and admissible upon the trial, yet they could furnish no good reason why a new trial should be granted, as a new trial will not be granted on the ground of newly discovered cumulative evidence. *Brooks v. Dutcher*, 22 Neb. 644; *Bell v. City of York*, 31 Neb. 842; *St. Louis v. State*, 8 Neb. 405.

We have given the whole record in this case as careful an examination as possible, in view of its great importance, and are persuaded that the killing of Rachael Engle

was of a most unusual character. There seems to have been no reason for the act. It is insisted by the state that it was prompted by a spirit of wanton, jealous rage, induced by seeing Smith in her company, and that it was a most heartless, cruel, cold-blooded and deliberate murder of an innocent, inoffensive girl, against whom there was no possible cause for ill will or hatred. Viewed from the standpoint of his complete sanity and legal accountability at the time of the shooting, this would seem to be true. She had never given him any offense, had never mistreated him in any way. His conduct in the home of the Kents had at all times been that of a gentleman, and he had never at any time sought to bestow his attentions upon her. Neither had sought nor avoided the association of the other. The conduct of both seems to have been exemplary in all respects. A solution of the motive which prompted the act is, to the mind of the writer, an impossibility. Plaintiff in error appears to have been most unfortunate and a great sufferer during the greater part of his life. We are fully persuaded that he should never be given his liberty, for he would be a menace to those with whom he should associate. The evidence tends strongly to convince us that, owing to his physical and mental condition, there may be grave doubts as to his responsibility for his acts at the time of the tragedy, and yet he is neither an idiot, an imbecile, nor a maniac. We can find no justification for taking his life, nor should he ever be discharged from confinement.

Under the provisions of section 509a of the criminal code, the judgment of the district court will be modified to the extent that the sentence will be changed from the infliction of the penalty of death to that of imprisonment in the state penitentiary at hard labor during his natural life, but without solitary confinement, and as thus modified the judgment will be, and is, affirmed.

                               AFFIRMED: SENTENCE REDUCED.