WILLIAM W. CRYDERMAN v. STATE OF NEBRASKA.

FILED MARCH 31, 1917. No. 19749.

1. **Criminal Law: HOMICIDE: CORPUS DELICTI: PROOF.** The extrajudicial confession of the defendant is not of itself sufficient evidence of murder in the first degree to establish the *corpus delicti.* There must be also other evidence. But circumstantial evidence is competent for that purpose.

2. ———: ———: ———: ———. If the evidence other than the extrajudicial confession of the defendant establishes that the human being alleged has been killed by violence not self-inflicted, the *corpus delicti* is proved.

3. **Homicide:** SENTENCE: STATUTE. It has long been recognized that section 9179, Rev. St. 1913, is to be liberally construed in favor of justice, as a remedial statute, and that it is the duty of this court to determine, from a consideration of the evidence, whether the death penalty upon conviction of murder in the first degree is warranted by the evidence under the circumstances in the case being considered.

4. ———: REDUCTION OF SENTENCE. In such case, although the defendant is not insane, and he is capable of understanding the nature of his act, still if the evidence shows that his mind was not normal, and was not entirely reliable as a regulator of his conduct, and no rational motive for the crime appears, such evidence will not justify the infliction of the death penalty, and the punishment will be reduced to imprisonment for life.

ERROR to the district court for Cherry county: WILLIAM H. WESTOVER, JUDGE. *Affirmed. Sentence reduced.*

*Sterling F. Mutz,* for plaintiff in error.

*Willis E. Reed, Attorney General,* and *Charles S. Roe, contra.*

SEDGWICK, J.

By information filed in the district court for Cherry county, Nebraska, the defendant, William W. Cryderman, was charged with the crime of murder in the first degree. It was alleged that he did kill and murder one Nellie Heelan in said county. The jury found the defendant guilty of murder in the first degree, and in their verdict added: "We further find and say that the defendant William W. Cryderman shall suffer death." The court thereupon sentenced the defendant to suffer death by electrocution, and the case has been brought to this court for review.

1. The first contention is that the *corpus delicti* is not proved. An alleged confession of the defendant was in evidence, and it is now insisted that there is no other evidence, proving or tending to prove the *corpus delicti*. The guilt of the defendant must be proved beyond a reasonable

doubt. The extrajudicial confession of the defendant alone is not sufficient evidence to justify conviction. There must be other substantial evidence of the *corpus delicti;* but in proving the *corpus delicti* circumstantial evidence is competent as in proof of other elements of the crime. It has sometimes happened that a defendant has been convicted of murder in the first degree upon a circumstantial and detailed confession of the murder on his part, when in fact no murder had been committed. In view of these circumstances, the rule became established that the death of the supposed victim must be established by other evidence than the confession of the defendant. Afterwards the rule was so extended as to require independent evidence that the death of the victim was by violence and not self-inflicted. Many details are suggested in the brief as elements of the *corpus delicti* which have never been so considered. If there is evidence, direct or circumstantial, other than the confession of the defendant, that the person alleged to have been murdered was killed by violence not self-inflicted, the *corpus delicti* is sufficiently proved.

Mr. Heelan and his wife and daughter resided on a ranch in Cherry county, and in the summer or fall of 1915 this defendant began working for Mr. Heelan on the ranch, and on the 13th of October it was necessary for Mr. Heelan to be away from home for a short time, and Mrs. Heelan procured a neighbor, Mrs. Layport, to stay with her over night in Mr. Heelan's absence. In the evening the dwelling house was burned, and the bodies of Mrs. Heelan and Mrs. Layport were found in the ruins. A search was immediately made for the defendant, and he was apprehended at Valentine the next morning. He freely confessed the murder, and answered, under oath, without hesitation, the questions that were put to him in regard to it, and finally, when his statement had been reduced to writing, he read it and signed it as a correct statement of the manner in which the crime was committed. In this statement he said that he had been hauling hay and coal the day prior to the murder, and he used four horses in hauling coal. While

so engaged he met the two women, Mrs. Heelan and Mrs. Layport, and told Mrs. Heelan that one of the horses had been sick, "and she told me I ought to have known better than to drive a sick horse. * * * Right after the women got home we had more talk about the horse, and I got very angry. The two women got some mail, and were sitting at the table in the kitchen reading the mail, along about nine o'clock. I was out on the back porch thinking things over. I was very angry about the way she had talked to me about the horse, and the more I thought about it the more angry I got. I had a feeling that I must have revenge. The gun, a double-barrel 12-gauge shot gun, was out in the barn. I decided while on the porch that I would go get the gun and kill both of the women. I went out to the barn and loaded the gun, and came back to the window at the southeast corner of the kitchen, and while Mrs. Heelan was reading a newspaper at the northeast corner of the table I shot her in the head. She was killed instantly. I then stepped inside the door and shot Mrs. Layport in the head; she was stooped over near the sink in the kitchen when I shot her. I then wrote the note which was found in the barn, and took it out and left it." He then set fire to the dwelling house in which these two women were, and took one of the horses and rode to Arabia, and stayed there about an hour, and then to Woodlake, and from there by freight train to Valentine. He intended to leave on the railroad the next day, but was arrested by the sheriff. The statement continued: "After killing the women I took some money, a little more than a dollar, out of Mrs. Layport's handbag, and also took Mrs. Layport's watch, from up-stairs, and took it along with me. I also took Mrs. Heelan's rosary. This was down-stairs on the sewing machine when I got it. I also took a comb and a prayer book from down-stairs. There was just the two women and myself present at the time I shot them." This statement was extrajudicial, and would be subject to the suggestion above that it could not of itself be sufficient to establish the *corpus delicti.* The defendant, however, offered himself as a witness upon the

trial, and testified in detail and at great length in corroboration of the statements in the writing that he signed, and also stated in express words under oath that the said writing which he signed was a true and correct statement of the facts. There were other circumstances tending to show that the crime was committed as detailed by the defendant, and sufficient of themselves without the assistance of the extrajudicial statement of the defendant, and probably even without his evidence in open court to establish the *corpus delicti.*

2. The question of the defendant's sanity is presented in the briefs. There is very much evidence in the record tending to show that he was not insane, and there was no witness called to prove the defendant's insanity except the defendant himself. Several expert witnesses testified that the defendant was not insane. There is no doubt from this evidence that the defendant fully understood the nature of his act, and knew the difference between right and wrong. There can be no doubt of his guilt. The question still remains whether the death penalty is too severe. Section 9179, Rev. St. 1913, has been several times applied in cases of this nature. In *Anderson v. State,* 26 Neb. 387, it is said that this statute "is a remedial one, and, like all statutes of that class, is to be liberally construed in favor of justice. The act of reducing the sentence and rendering a new one in accordance with the evidence, is in no sense a commutation of the former sentence. That can be granted only by the executive of the state, and is granted or refused as a matter of discretion. The reduction of a sentence, however, is a matter of right upon which the prisoner may insist when that imposed is in excess of what the evidence will justify. In other words, the statute makes it the duty of this court, when the proper proceedings are had, to review the evidence, and prevent the imposition of punishment which the evidence will not warrant."

In *O'Hearn v. State,* 79 Neb. 513, it was held that under the circumstances there shown punishment of death was excessive, and the sentence was reduced to imprisonment

for life. The court said: "The verdict in so far as it responded to the issues of guilty or not guilty of the crime of murder in the first degree was fully justified." But, because of the defendant's immature years and because of other circumstances shown in the evidence, the court concluded that the death sentence, "taking all the circumstances of the case into consideration, is excessive," and reduced it to imprisonment in the state penitentiary during life.

*Hamblin v. State*, 81 Neb. 148, was very similar to the facts in the case at bar, so far as the severity of the punishment was concerned. The court said that it was "persuaded that the killing of Rachael Engle was of a most unusual character. There seems to have been no reason for the act. It is insisted by the state that it was prompted by a spirit of wanton, jealous rage, induced by seeing Smith in her company, and that it was a most heartless, cruel, cold-blooded and deliberate murder of an innocent, inoffensive girl, against whom there was no possible cause for ill will or hatred. Viewed from the standpoint of his complete sanity and legal accountability at the time of the shooting, this would seem to be true. She had never given him any offense, had never mistreated him in any way. * * * A solution of the motive which prompted the act is, to the mind of the writer, an impossibility. Plaintiff in error appears to have been most unfortunate and a great sufferer during the greater part of his life. We are fully persuaded that he should never be given his liberty, for he would be a menace to those with whom he should associate. The evidence tends strongly to convince us that, owing to his physical and mental condition, there may be grave doubts as to his responsibility for his acts at the time of the tragedy, and yet he is neither an idiot, an imbecile, nor a maniac. We can find no justification for taking his life, nor should he ever be discharged from confinement."

In a somewhat similar case this language is referred to and approved, and the death sentence reduced to imprisonment for life. *Muzik v. State*, 99 Neb. 496. So that sec-

tion 9179, Rev. St. 1913, has been continually construed to require the reduction of the death penalty to imprisonment for life under circumstances that render that the proper penalty. This defendant at the time of the commission of this crime was a boy of 18 years of age. He had not had the benefits of home for several years, but had led a wandering life with varied experiences. He testified that he had been in a hospital for several weeks, and was "taken in charge for being crazy, * * * my folks and a couple of other parties in town" filed the complaint. The crime was not committed for profit or gain. No rational motive appears. He evidently at first contemplated committing suicide, and when he finally escaped from the scene of the crime he took the prayer book and rosary of his victims, a watch, and $1 in money, but very little of value. There was no evidence as to the value of the watch. He stayed around a small nearby station for several hours, and made no reasonable effort to get beyond the reach of the officers until well along into the succeeding day. As was said in the case last above cited, if his mind was not wholly deranged, it was not normal, and was not entirely reliable as a regulator of his conduct.

The judgment of conviction is affirmed, but the penalty is reduced to imprisonment for life.

SENTENCE REDUCED.

MORRISSEY, C. J., not sitting.

ROSE, J. I do not find in the record any reason for interfering with the verdict of the jury or with the sentence of the trial court.