Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/30/2022 09:08 AM CDT

State of Nebraska, appellee, v.
Joshua W. Keadle, appellant.

___ N.W.2d ___

Filed July 8, 2022.    No. S-20-580.

1. **Convictions: Evidence: Appeal and Error.** Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

2. **Criminal Law: Appeal and Error.** The "corpus delicti" is the body or  substance of the crime—the fact that a crime has been committed, without regard to the identity of the person committing it.

3. **Criminal Law: Words and Phrases.** The corpus delicti requirement is composed of two elements: the fact or result forming the basis of a charge and the existence of a criminal agency as the cause thereof.

4. **Criminal Law: Circumstantial Evidence: Proof.** Nebraska requires that the corpus delicti of a crime must be established by evidence beyond a reasonable doubt, but it may be proved by either direct or circumstantial evidence.

5. **Circumstantial Evidence: Words and Phrases.** Circumstantial evidence is evidence which, without going directly to prove the existence of a fact, gives rise to a logical inference that such fact exists.

6. **Convictions: Confessions: Evidence: Proof.** A criminal conviction cannot be sustained solely upon a defendant's extrajudicial admission

or voluntary confession, but either or both are competent evidence of corpus delicti and may, with corroborative evidence of facts and circumstances, establish the corpus delicti and guilty participation of the defendant.

7. **Criminal Law: Homicide: Proof.** In homicide cases, the corpus delicti requirement is not established until it is proved that a human being is dead and that the death occurred as a result of the criminal agency of another.

8. ____: ____: ____. The body of a missing person is not required to prove the corpus delicti for homicide.

9. **Homicide: Circumstantial Evidence.** The failure to recover a body may, itself, be circumstantial evidence of the corpus delicti of homicide, because it is highly unlikely that a person who dies from natural causes will successfully dispose of his or her own body.

10. ____: ____. In the absence of a body, confession, or other direct evidence of death, circumstantial evidence may be sufficient to support a conviction for murder.

11. ____: ____. There is no reason to treat the crime of murder differently from other crimes when considering the use of circumstantial evidence to establish their commission, and the presence or absence of a particular item of evidence is not controlling. The question is whether from all of the evidence it can reasonably be inferred that death occurred and that it was caused by a criminal agency.

12. **Convictions: Circumstantial Evidence.** Under Nebraska law, the accused's rule has no application when reviewing the sufficiency of circumstantial evidence to support a criminal conviction, and it has no application when reviewing the sufficiency of circumstantial evidence to support corpus delicti.

Appeal from the District Court for Gage County: RICKY A. SCHREINER, Judge. Affirmed.

Jeffery A. Pickens, of Nebraska Commission on Public Advocacy, for appellant.

Douglas J. Peterson, Attorney General, and Melissa R. Vincent for appellee.

HEAVICAN, C.J., MILLER-LERMAN, CASSEL, STACY, FUNKE, and PAPIK, JJ., and HARDER, District Judge.

STACY, J.

Tyler Thomas, a student at Peru State College (PSC) in Peru, Nebraska, has been missing since the early morning hours of December 3, 2010. Her body has never been found. Joshua W. Keadle is the last person known to have seen Thomas alive. In 2017, Keadle was charged with first degree murder in connection with Thomas' disappearance. A jury found Keadle guilty of second degree murder, and he was sentenced to prison. Keadle appeals, assigning only that the evidence adduced at trial was insufficient to establish the corpus delicti of homicide. Finding no merit to this assignment, we affirm.

## I. BACKGROUND

### 1. THOMAS' DISAPPEARANCE

In the fall of 2010, Thomas was a 19-year-old student attending PSC. She lived on campus in a coed dormitory (dorm). On the evening of December 2, 2010, Thomas attended a series of parties, consumed alcohol, and became visibly intoxicated. After getting into an argument with friends at one of the parties, Thomas was asked to leave. She declined a ride back to her dorm, and instead left the party on foot, heading in the direction of campus. She also made statements about wanting to go back to Omaha, Nebraska, and walking there if necessary. The weather was cold, and Thomas was not wearing a coat.

Thomas was seen by others walking on the PSC campus between 1 and 1:30 a.m. on December 3, 2010, but she never made it back to her dorm. At approximately 1:25 a.m., several of Thomas' friends received text messages from Thomas' phone indicating that Thomas did not know where she was. The last such message was sent and received at 1:28 a.m., prompting Thomas' friends to begin searching for her, without success. After a couple of hours, her friends contacted law enforcement to report Thomas missing. Law enforcement searched for Thomas without success. Organized search efforts continued for the next several days.

PSC conducted a room-by-room search of the dorm complex, but Thomas was not located. Thomas' purse was found in her dorm room, along with her driver's license, birth certificate, Social Security card, keys, debit cards, a gift card, and a check from PSC in the amount of $1,104.22.

Officers from the Nemaha County sheriff's office and Nebraska State Patrol, along with hundreds of volunteers, searched for Thomas on the ground. Helicopters searched from the air. A search of the Missouri River was conducted using divers and sonar. Law enforcement disseminated information about Thomas' disappearance on a national scale, including entering her information in the National Crime Information Center database and the database of the National Center for Missing and Exploited Children. A DNA profile for Thomas was developed from some of her personal belongings and entered into a national DNA database used to identify missing persons.

Thomas has never been located. Her cell phone has never been found. Friends and family who had regular contact with Thomas before her disappearance have not heard from her since. According to a credit report, Thomas' only financial activity since her disappearance has been a failure to pay student loans.

## 2. Keadle Interviews

Keadle was also a student at PSC in the fall of 2010. At the time Thomas disappeared, Keadle was living in the same coed dorm complex as Thomas and their suites were near one another. There was evidence that Keadle and Thomas did not get along. PSC students observed Keadle and Thomas get into "heated argument[s]" with each other, and multiple students claim to have heard Keadle use derogatory terms when referring to Thomas. During the investigation of Thomas' disappearance, law enforcement interviewed Keadle several times. The admissibility of those interviews is not at issue.

The first such interview occurred on December 4, 2010, when Keadle spoke with a Nebraska State Patrol trooper about

his whereabouts the night Thomas disappeared. Keadle told the trooper that on the evening of December 2, he drove with friends to Nebraska City, Nebraska, to see a movie, which ended shortly after midnight on December 3. Keadle and his friends drove back to Peru, picked up some additional friends, and headed back to the dorm complex to "hang out." Keadle said that while driving back, he saw Thomas walking in the direction of the dorm complex sometime between 1:10 and 1:15 a.m. and that she appeared to be intoxicated.

Keadle told the trooper that after arriving at the dorm complex, he separated from his friends because he was not feeling well. He returned to his dorm to use the restroom, after which he noticed a light coming from a nearby dorm room. He knocked on the door and two female students answered. They told Keadle about receiving a text message from Thomas saying she was lost, and they indicated they were going out to search for her.

On December 5, 2010, an investigator visited with Keadle in his dorm room and asked Keadle to provide a written statement detailing his activities from 5 p.m. on December 2 until he went to sleep on December 3. Keadle complied, and he produced a written statement which was largely consistent with what he had told the trooper the day before. The investigator then asked some followup questions about Keadle's and Thomas' relationship. Keadle told the investigator that he and Thomas did not get along. When asked where he thought Thomas was, Keadle responded that he thought Thomas was in Omaha and was fine.

On December 6, 2010, law enforcement conducted a recorded interview with Keadle, in which he generally recounted the same version of events that he provided previously. When investigators asked Keadle whether there was a reason he would have left campus around the time Thomas disappeared, Keadle denied leaving his dorm room at all. Investigators then asked Keadle whether there was a reason that he would be on surveillance cameras outside of the dorm complex, and Keadle responded that he went to his vehicle to get change at

one point. Later, when asked about his cell phone's satellite location, Keadle admitted that he left his dorm around 2:30 a.m. on December 3 and drove to the Missouri River to smoke marijuana. He also admitted driving back to the river the next morning, again to smoke. But Keadle repeatedly denied seeing Thomas either time he went to the river. When asked why Thomas' phone would be showing it was located at the river, Keadle said he had "no clue." He told law enforcement that if they wanted to check his vehicle, he would unlock it and they could bring their cadaver dogs.

On December 7, 2010, law enforcement conducted another recorded interview with Keadle. They told Keadle they had obtained additional information through their investigation which raised concerns about the timeline he provided. When pressed, Keadle insisted that he had not been with Thomas the night she disappeared. But eventually, Keadle remarked, "You're not going to believe me, man." When interviewers assured Keadle that they would believe him, Keadle said, "Okay, here's what happened."

Keadle proceeded to tell the officers that during the early morning hours of December 3, 2010, as he was driving to the river to smoke marijuana, Thomas "popped out" of some bushes. He let her into his vehicle, and she accompanied him to the boat ramp at the river. Keadle said that Thomas appeared to be upset and that she told him about having an argument with her friends earlier that night. At some point during their conversation, Thomas asked Keadle for a ride to Omaha. Keadle said he initially refused, but Thomas said she could "do something" for him if he agreed to take her to Omaha, and she began rubbing his crotch. According to Keadle, Thomas refused to have sex with him because she was menstruating, and she was unwilling to perform oral sex. But Keadle said that Thomas was willing to perform a "hand job" in exchange for a ride to Omaha and that he agreed. Keadle told the officer that he ejaculated into a napkin and threw the napkin on the ground. No napkin was recovered from the scene.

Keadle said that after this sexual encounter with Thomas, he walked to the edge of the river to smoke. It was then that Keadle decided he did not want to drive Thomas to Omaha after all. When he told Thomas this, she became angry. According to Keadle, Thomas ran toward him, started hitting him, swore at him, and threw her phone at him as he stood near the river. Keadle stated that he grabbed Thomas' wrists and told her to "quit playing," but that Thomas screamed at him and said she would tell the police that Keadle had raped her. Keadle offered Thomas a ride back to her dorm, but she refused to get back into his vehicle. Keadle said that he left the river without Thomas and that she was still screaming as he drove away.

Keadle said he was worried that Thomas would make good on her threat to accuse him of rape, so when he got back to his dorm, he showered to get Thomas' DNA off. Keadle told officers that after the shower, he decided to go out looking for Thomas. He drove back to the river and walked around the area north of the boat ramp with a flashlight, yelling her name. When he did not find Thomas near the river, he drove to a graveyard, but did not find her there. Keadle said that he grew concerned about his potential criminal liability and whether he could be charged with homicide if Thomas "comes up . . . frozen to death." So Keadle said he used his cell phone to research possible scenarios, which he described in his interview as "what if her body . . . ends up in the river and my fingerprints are gonna be on her from where I grabbed her," "forensic evidence," and "fingerprints in the water."

When asked during his December 7, 2010, interview whether his DNA would be found on Thomas' body, Keadle said he put his hand down the back of Thomas' pants during the sexual encounter. And when asked whether Thomas' body would show any injuries, Keadle responded that Thomas may have bruises on her wrists or elbows from where he had grabbed her. Keadle then remarked that it would "be a lot different" if they found her body and discovered she had been stabbed or shot.

### 3. OTHER EVIDENCE

### (a) Passengers in Keadle's Vehicle

Law enforcement also interviewed the passengers who rode in Keadle's vehicle on the night Thomas disappeared. Like Keadle, the passengers reported seeing Thomas walking toward the coed dorm complex around 1:15 a.m. on December 3, 2010, and thought she looked intoxicated. One of the passengers said he asked about offering Thomas a ride, but Keadle responded, "'No. She is like that all the time, just leave her.'" The passengers also said that they had plans to "hang out" with Keadle after they arrived at the dorm complex, but that Keadle separated from them and they were not able to reach him for a while after that. One of the passengers reported that Keadle sent her a text message at 2:13 a.m., stating, "My stomach is killin me. I'm [expletive] my guts out! And throwing up." He texted her again at 2:15 a.m., stating, "I was in the shower. Good night!" He texted her once more at 2:42 a.m., saying, "I'm goin for a ride, want to come?" She did not reply.

### (b) Video Surveillance

Law enforcement obtained video surveillance footage from a bank in Peru, showing traffic on Fifth Street during the early morning hours of December 3, 2010. Fifth Street connects with another street that leads to the boat ramp at the Missouri River. At 2:09 a.m., and again at 3:15 a.m., the video showed Keadle's vehicle traveling southbound on Fifth Street toward the PSC campus.

### (c) Drag Marks and Tire Tracks

In the days following Thomas' disappearance, members of law enforcement searched the area near the Missouri River for evidence. In an area located just north of the boat ramp where Keadle admitted he had been with Thomas before she disappeared, they observed what appeared to be "drag marks" leading to the riverbank and down toward the water. The drag marks were located near a set of tire tracks that were consistent with the tires on Keadle's vehicle.

### (d) Keadle's Vehicle

Approximately 5 days after Thomas' disappearance, law enforcement impounded and searched Keadle's vehicle, a 1996 Ford Explorer. Law enforcement searched the vehicle again in 2016. Neither search revealed evidence of bloodshed or evidence of Thomas' DNA profile. The expert who searched Keadle's vehicle in 2016 noted there were more than 100 stains on the carpeting, ceiling, and door of Keadle's vehicle, but there were no stains on the seats; the seats appeared to be "brand new" compared to the rest of the vehicle.

### (e) Keadle's Statements to Others

Over the course of the investigation, law enforcement learned that Keadle had asked several PSC students to provide alibis. One student, who had been a passenger in Keadle's vehicle the night Thomas went missing, said Keadle approached him the next morning and said, "[I]f anybody says anything or if anybody asks, . . . can you tell them that I was with you guys all night?" One of Keadle's roommates (who had been out of town on the night Thomas disappeared) recalled a similar conversation. Keadle told the roommate that the "cops were by asking questions" and that if he "got asked about it," he should say that Keadle was with him the night Thomas disappeared.

The day after Thomas went missing, Keadle was talking with a fellow PSC student while waiting in line to be interviewed by police. Keadle told the student he had a gun and asked whether the student would "hold it" for him. The student refused. The same student reported seeing Keadle with a gun once earlier that semester, and another student reported that Keadle told her he kept a gun under the passenger seat of his vehicle. No gun was ever recovered.

A few months after Thomas disappeared, Keadle was in the Nemaha County jail and commented to a cellmate about Thomas' disappearance. The cellmate did not report the comment to law enforcement until 2017, after learning that Keadle had been arrested for Thomas' murder. At that time, the cellmate reported that while they were incarcerated together in

2011, Keadle said that he "'[f]ucked [Thomas] and left her at the dock,'" but "'will never go to prison because they will never find the body.'"

### 4. Criminal Charges and Trial

Keadle was arrested on December 8, 2010, in connection with Thomas' disappearance, but he was not prosecuted at that time. He was arrested again in October 2017 and was eventually charged with the first degree murder of Thomas, a Class IA felony. The information was filed in Nemaha County District Court, but Keadle successfully moved for a change of venue, and the case was transferred to Gage County.

A jury trial commenced on January 28, 2020. The State introduced evidence about Thomas' active social and extra-curricular life at PSC, as well as her close relationships with family members and friends, none of whom had seen or heard from Thomas since her disappearance. The State also introduced the evidence described above regarding the investigation into Thomas' disappearance, including Keadle's interviews, Keadle's statements to others, the bank surveillance footage, the searches of Keadle's vehicle, and the drag marks found by the river.

Keadle did not testify in his own defense, but he offered evidence suggesting several possible explanations for Thomas' sudden disappearance. Keadle introduced evidence of difficulties Thomas was experiencing in dating and personal relationships in the months leading up to her disappearance. He introduced posts from Thomas' social media accounts in which she described "'starting to slowly break down'" and drinking too much alcohol. And Keadle also introduced expert testimony on accidental hypothermia through a forensic pathologist and medical doctor. The pathologist testified about instances where intoxicated individuals had wandered off in cold weather and succumbed to hypothermia. On cross-examination, he admitted that if there was evidence that someone purposely took another person out to a place where

that person would not be able to get back to safety, "you would call [that] a homicide."

At the close of the evidence, Keadle moved to dismiss the complaint, asserting the evidence was insufficient to establish the corpus delicti of homicide. The district court overruled the motion, and the matter proceeded to a jury instruction conference. Keadle asked the court to give a tendered jury instruction addressing corpus delicti, which the district court refused. No error has been assigned to that ruling or to any of the jury instructions.

### 5. Jury Verdict and Sentence

The jury was given a standard step instruction and was told it could return a verdict of (1) guilty of murder in the first degree, (2) guilty of murder in the second degree, (3) guilty of sudden quarrel manslaughter, or (4) not guilty. The jury returned a verdict finding Keadle guilty of second degree murder. The judge accepted the verdict and sentenced Keadle to imprisonment for a term of 71 years to life.

Keadle appeals, represented by his trial counsel.

## II. ASSIGNMENT OF ERROR

Keadle assigns that the evidence adduced at trial was insufficient to establish the corpus delicti of homicide beyond a reasonable doubt.

## III. STANDARD OF REVIEW

[1] Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is

sufficient to support the conviction.[1] The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[2]

## IV. ANALYSIS

In this appeal, Keadle does not argue that the evidence adduced at trial was insufficient to convict him of second degree murder.[3] Instead, his only assignment of error is that the evidence adduced was insufficient to establish the corpus delicti of homicide beyond a reasonable doubt. We limit our analysis accordingly, and we begin with a review of the corpus delicti requirement in Nebraska.

### 1. Corpus Delicti

[2] The "corpus delicti" is the body or substance of the crime—the fact that a crime has been committed, without regard to the identity of the person committing it.[4] For more than a century, Nebraska cases have recognized a corpus delicti requirement for criminal convictions.[5] While we have considered the corpus delicti requirement in cases involving murder,[6]

---

[1] *State v. Hassan*, 309 Neb. 644, 962 N.W.2d 210 (2021).

[2] *State v. Stack*, 307 Neb. 773, 950 N.W.2d 611 (2020).

[3] See Neb. Rev. Stat. § 28-304(1) (Reissue 2016) ("[a] person commits murder in the second degree if he [or she] causes the death of a person intentionally, but without premeditation").

[4] *State v. Edwards*, 278 Neb. 55, 65, 767 N.W.2d 784, 795 (2009).

[5] See, e.g., *Dodge v. The People*, 4 Neb. 220, 230-31 (1876) ("[a] confession alone ought not to be sufficient evidence of the *corpus delicti*. There should be other proof that a crime has actually been committed, and the confession should only be allowed for the purpose of connecting the defendant with the offense").

[6] See, e.g., *State v. Golyar*, 301 Neb. 488, 919 N.W.2d 133 (2018); *Edwards, supra* note 4; *Gallegos v. State*, 152 Neb. 831, 43 N.W.2d 1 (1950); *Egbert v. State*, 113 Neb. 790, 205 N.W. 252 (1925); *Cryderman v. State*, 101 Neb. 85, 161 N.W. 1045 (1917).

we have also considered it in cases involving receiving a stolen automobile,[7] larceny,[8] forgery,[9] arson,[10] embezzlement of public money,[11] possession of cocaine,[12] destruction of property,[13] and leaving the scene of an accident,[14] to name a few.

[3-5] We have described the corpus delicti requirement as being composed of two elements: the fact or result forming the basis of a charge and the existence of a criminal agency as the cause thereof.[15] Nebraska requires that the corpus delicti of a crime must be established by evidence beyond a reasonable doubt, but it may be proved by either direct or circumstantial evidence.[16] Circumstantial evidence is evidence which, without going directly to prove the existence of a fact, gives rise to a logical inference that such fact exists.[17]

[6] When describing the type of evidence that will satisfy the corpus delicti requirement, our rule has changed over time.[18]

---

[7] *Limmerick v. State*, 120 Neb. 558, 234 N.W. 98 (1931).

[8] *Smith v. State*, 17 Neb. 358, 22 N.W. 780 (1885).

[9] *Blacker v. State*, 74 Neb. 671, 105 N.W. 302 (1905).

[10] *Maher v. State*, 144 Neb. 463, 13 N.W.2d 641 (1944).

[11] *Haines v. State*, 170 Neb. 304, 102 N.W.2d 609 (1960).

[12] *State v. Thompson*, 244 Neb. 189, 505 N.W.2d 673 (1993).

[13] *State v. Babajamia*, 223 Neb. 804, 394 N.W.2d 289 (1986).

[14] *State v. Nichols*, 175 Neb. 761, 123 N.W.2d 860 (1963).

[15] *Edwards, supra* note 4.

[16] *Id.* See, also, *State v. Stubbendieck*, 302 Neb. 702, 924 N.W.2d 711 (2019); *Golyar, supra* note 6; *Gallegos, supra* note 6.

[17] *Stubbendieck, supra* note 16.

[18] Compare rule as explained in *Dodge, supra* note 5 (providing that corpus delicti must be proved by evidence other than defendant's confession), with *Limmerick, supra* note 7 (providing that confessions may be considered with other evidence to establish corpus delicti), and *Egbert, supra* note 6, 113 Neb. at 795, 205 N.W. at 254 (providing that corpus delicti may be proved by extrajudicial confession along with "slight corroborating circumstances").

But our modern cases recite that although a conviction cannot be sustained solely upon a defendant's extrajudicial admission or voluntary confession, "either or both are competent evidence of [corpus delicti] and may, with corroborative evidence of facts and circumstances, establish the corpus delicti and guilty participation of the defendant."[19]

[7-9] In homicide cases, the corpus delicti requirement is not established until it is proved that a human being is dead and that the death occurred as a result of the criminal agency of another.[20] But "the body of a missing person is not required to prove the corpus delicti for homicide."[21] We have explained that "[t]o require that the victim's body be discovered would be unreasonable; it would mean that a murderer could escape punishment by successfully disposing of the body, no matter how complete and convincing the other evidence of guilt."[22] Moreover, the failure to recover a body may, itself, be circumstantial evidence of corpus delicti:

> "The fact that [the victim's] body was never recovered would justify an inference by the jury that death was caused by a criminal agency. It is highly unlikely that a person who dies from natural causes will successfully dispose of his [or her] own body. Although such a result may be a theoretical possibility, it is contrary to the normal course of human affairs.
>
> "The fact that a murderer may successfully dispose of the body of the victim does not entitle him [or her] to an

---

[19] *Stubbendieck, supra* note 16, 302 Neb. at 719, 924 N.W.2d at 724. See, also, *Egbert, supra* note 6.

[20] *Edwards, supra* note 4. See, also, *Golyar, supra* note 6; *Gallegos, supra* note 6.

[21] *Edwards, supra* note 4, 278 Neb. at 66, 767 N.W.2d at 796.

[22] *Id.*

acquittal. That is one form of success for which society has no reward."[23]

We have, in two prior cases, found that circumstantial evidence associated with a missing person's disappearance was sufficient to establish a death by criminal agency, and thus sufficient to establish the corpus delicti of homicide.[24] Both cases are instructive.

In *State v. Edwards*,[25] the victim disappeared suddenly after telling a friend that she was on her way to see the defendant. The defendant was charged with murder in connection with the victim's disappearance, and the jury ultimately convicted him of second degree murder. On appeal, the defendant argued there was insufficient evidence to establish the corpus delicti of homicide, because the victim's body had not been found, he had not confessed to the victim's murder, and there was no direct evidence that any death was caused by criminal agency.

[10,11] We found there was sufficient circumstantial evidence to prove corpus delicti, explaining:

The law is clear that in the absence of a body, confession, or other direct evidence of death, circumstantial evidence may be sufficient to support a conviction for murder. There is no reason to treat the crime of murder differently from other crimes when considering the use of circumstantial evidence to establish their commission,

---

[23] *Id.* at 66-67, 767 N.W.2d at 796, quoting *People v. Manson*, 71 Cal. App. 3d 1, 139 Cal. Rptr. 275 (1977). See, also, *Limmerick, supra* note 7, 120 Neb. at 560, 234 N.W. at 99 (remarking that "[g]uilty men would often escape just punishment if the rule prevailed, as in early times, that a conviction could not be obtained in a homicide case unless the *corpus delicti* was proved by direct evidence which necessitated the finding of the victim's body in every case" and that such a rule "made murderers safe if the body of the victim was burned or placed in the bottom of the sea").

[24] See, *Golyar, supra* note 6; *Edwards, supra* note 4.

[25] *Edwards, supra* note 4.

and "[t]he presence or absence of a particular item of evidence is not controlling. The question is whether from all of the evidence it can reasonably be inferred that death occurred and that it was caused by a criminal agency." The presence of a confession, admission, or incriminating statement is a distinction without a difference.[26] In discussing the circumstantial evidence establishing the corpus delicti, *Edwards* noted there was evidence that the victim's habits and relationships had been abruptly severed without explanation, that she had abandoned all of her personal effects and her pet, and that she had not picked up her paycheck or used her bank account since her disappearance. We described this as persuasive circumstantial evidence of an involuntary disappearance and death by foul play.

Additionally, *Edwards* noted that evidence of "what was almost certainly [the victim's] blood . . . found in [the defendant's] bedroom and the trunk of his automobile is highly suggestive of an unlawful killing."[27] *Edwards* also found circumstantial evidence of corpus delicti based on evidence that the defendant had taken steps to conceal the victim's disappearance and to cover up the blood evidence, explaining that the "fact that such evidence also bears on who is guilty does not detract from its efficacy at establishing the corpus delicti."[28] *Edwards* thus concluded that despite the absence of a confession or admission from the defendant, the circumstantial evidence was easily sufficient to prove the corpus delicti of homicide.

In *State v. Golyar*,[29] the victim also disappeared suddenly and unexpectedly and her body was never found. Four years later, the defendant, who considered the victim a romantic rival, was charged with first degree murder in connection

---

[26] *Id.* at 68-69, 767 N.W.2d at 797.

[27] *Id.* at 67, 767 N.W.2d at 797.

[28] *Id.* at 68, 767 N.W.2d at 797.

[29] *Golyar, supra* note 6.

with the victim's disappearance. The defendant was convicted after a bench trial, and she appealed, arguing, among other things, that the evidence was insufficient to prove the victim was dead.

Our opinion in *Golyar* cited *Edwards* for the settled propositions that the body of a missing person is not required to prove the corpus delicti of homicide and that circumstantial evidence associated with the victim's disappearance can be sufficient to establish the victim's death. With respect to corpus delicti, the defendant in *Golyar* was challenging only the sufficiency of proof that a death had occurred, and we limited our analysis accordingly. We noted there was evidence that the victim abruptly ended her contacts with her teenage son, her parents, her employer, and her boyfriend, and had not been seen for years. There was evidence that the victim's money had not been accessed since her disappearance, aside from the use of her debit card on one occasion (which was later linked to the defendant). The victim's own blood was found in her abandoned vehicle. There was evidence that the defendant had been posing as the victim online and in social media in an attempt to conceal the victim's disappearance. And there were photographs of what appeared to be body parts with tattoos identical to those of the victim discovered on the memory card from a cell phone belonging to the defendant. We concluded that a rational trier of fact, viewing this circumstantial evidence in the light most favorable to the State, could have concluded beyond a reasonable doubt that the victim was no longer alive.

In this case, Keadle argues that the State failed to prove the corpus delicti of homicide beyond a reasonable doubt. When making this argument below, Keadle purported to rely primarily upon our well-settled rule that criminal convictions cannot be sustained solely upon extrajudicial admissions or confessions.[30] To that end, Keadle urged that if his

---

[30] See *Stubbendieck, supra* note 16.

extrajudicial admissions had been excluded from consideration, the remaining evidence adduced by the State would have been insufficient to establish that Thomas' death was the result of criminal conduct. But he did not preserve such an argument for appeal. In neither his appellate briefing, nor during his oral argument, did Keadle argue that the district court erred in considering his extrajudicial admissions when it determined that the evidence was sufficient to establish the corpus delicti of homicide. Instead, he argues more broadly that the evidence adduced at trial was insufficient to prove the corpus delicti of homicide beyond a reasonable doubt. In that respect, the corpus delicti arguments he raises now resemble those raised in *Edwards* and *Golyar*.

We pause here to observe that in a case where the conviction is not based solely on a confession or extrajudicial admission, it is not clear what purpose the corpus delicti requirement serves that is not already served by requiring the State to prove each material element of the charged crime beyond a reasonable doubt. But ultimately, because no one here has asked us to reconsider the utility of the corpus delicti requirement in such a case, that is a question for another day.

With this background in mind, we now turn to Keadle's argument that the evidence in this case was insufficient to prove the corpus delicti of homicide.

### 2. Evidence of Corpus Delicti

To determine whether the corpus delicti requirement was satisfied in this case, we view the evidence in the light most favorable to the State and consider whether any rational trier of fact could have found that Thomas is dead and that her death resulted from a criminal act.[31] On this record, we find ample circumstantial evidence to prove the corpus delicti of homicide beyond a reasonable doubt.

---

[31] See, *Golyar, supra* note 6; *Edwards, supra* note 4.

The evidence showed that Thomas was a young, active college student who regularly participated in extracurricular activities, often spoke with family members, and socialized with peers. But since Thomas' disappearance on December 3, 2010, none of her friends or family members have heard from her. Her habits and relationships were abruptly severed without explanation, and she left behind her driver's license, birth certificate, Social Security card, keys, debit cards, a gift card, and a sizable check. Her credit history shows no financial activity since her disappearance, aside from a failure to pay student loans. Based upon this evidence, a reasonable fact finder could conclude beyond a reasonable doubt that Thomas is dead.

However, we do not understand Keadle's argument on appeal to dispute there was sufficient evidence that Thomas is dead. Instead, the primary focus of his argument is that the evidence adduced was insufficient to prove that her death was the result of a criminal act. Keadle argues that unlike *Edwards*, the State offered "no blood evidence, other biological evidence, or any other kind of physical evidence"[32] to suggest Thomas' death was caused by a criminal act.

Keadle is correct that *Edwards* found bloodstain evidence to be persuasive circumstantial proof that the victim in that case was dead and that her death was the result of the criminal act of another. But *Edwards* neither mandated nor suggested that blood or other biological evidence must be present for the State to prove corpus delicti in a homicide case where the body is never found. To the contrary, *Edwards* clarified that "'[t]he presence or absence of a particular item of evidence is not controlling'"[33] as to whether the corpus delicti requirement has been satisfied. The fact that the circumstantial evidence in this case did not include blood or DNA evidence is simply not dispositive of the corpus delicti requirement. Instead, "'[t]he

---

[32] Brief for appellant at 72.

[33] *Edwards, supra* note 4, 278 Neb. at 68, 767 N.W.2d at 797, quoting *People v. Bolinski*, 260 Cal. App. 2d 705, 67 Cal. Rptr. 347 (1968).

question is whether from all of the evidence it can reasonably be inferred that death occurred and that it was caused by a criminal agency.'"[34] We find ample circumstantial evidence to support the conclusion that Thomas died as a result of a criminal act.

First, the fact that Thomas' body was never recovered is, in and of itself, circumstantial evidence that her death was caused by a criminal act. As noted in *Edwards*, "'[i]t is highly unlikely that a person who dies from natural causes will successfully dispose of his [or her] own body.'"[35] Moreover, the fact that Thomas was a social, active young woman with many close personal relationships makes it unlikely that without another's involvement, she would simply disappear without a trace. There was also physical evidence supporting criminal activity in this case. As noted, law enforcement observed what appeared to be drag marks leading to the river in the area where Keadle admitted being with Thomas on the night she disappeared.

And Keadle's own admissions provide strong circumstantial evidence that Thomas' death resulted from criminal acts which he committed. Keadle admitted that he saw Thomas walking to her dorm the night she disappeared and that he thought she looked intoxicated. Keadle admitted that even though he and Thomas did not get along, he picked her up in his vehicle, drove her to the river, and engaged in sexual activity with her. He also admitted that he and Thomas had a physical altercation at the river, that Thomas may have sustained bruising during the altercation, and that during the altercation, Thomas threatened to accuse him of rape. He admitted that he left Thomas at the river after the altercation and that he drove back to his dorm where he showered to "get [Thomas'] DNA off of him," before heading back to the river a second time. This timeline was corroborated by the bank surveillance video. Keadle also admitted to police that he was concerned

---

[34] *Id.*

[35] *Id.* at 66, 767 N.W.2d at 796, quoting *Manson, supra* note 23.

about his criminal liability and had researched whether fingerprints can show up on bodies that have been submerged in water. From these admissions, a rational trier of fact could infer that when Keadle left the river that night, he did not leave Thomas alive.

Moreover, in the days following Thomas' disappearance, Keadle tried to procure an alibi from two PSC students and asked another student to hold a gun for him. And after Thomas' disappearance, Keadle told his cellmate that he "'[f]ucked [Thomas] and left her at the dock,'" but "'will never go to prison because they will never find the body.'" Based on this evidence, a rational trier of fact could find beyond a reasonable doubt that Thomas' death was the result of Keadle's criminal agency.

On this record, we find the evidence adduced at trial was easily sufficient to establish the corpus delicti of homicide beyond a reasonable doubt. Keadle's sole assignment of error is without merit.

For the sake of completeness, we note that Keadle also argues that the circumstantial evidence adduced at trial may support noncriminal explanations for Thomas' death, including that she "may have purposely or accidentally hurt herself."[36] Keadle points to evidence that Thomas was experiencing relationship problems and that on the night of her disappearance, she was intoxicated, angry, and "inappropriately dressed for the cold."[37] He argues that "[s]he was so desperate to get to Omaha, she offered a sexual favor to someone she disliked."[38] And he suggests that after she was "[l]eft at the river in the cold and the darkness while drunk and angry, anything could have happened to her. She might have fallen in the river. She might have jumped in the river."[39]

---

[36] Brief for appellant at 72.

[37] *Id.* at 73.

[38] *Id.*

[39] *Id.*

[12] Keadle made similar arguments to the jury in this case, and the jury rejected those arguments by returning a verdict finding Keadle guilty of second degree murder. Moreover, to the extent Keadle is suggesting that in order to prove the corpus delicti of homicide using circumstantial evidence, the State had to disprove all theories inconsistent with criminal agency, he is simply incorrect. Nebraska has rejected the accused's rule, and thus has abandoned "'any notion that before an accused may be convicted on the basis of circumstantial evidence alone, the State must disprove every hypothesis but that of guilt.'"[40] The accused's rule has no application when reviewing the sufficiency of circumstantial evidence to support a criminal conviction, and it has no application when reviewing the sufficiency of circumstantial evidence to establish corpus delicti.

## V. CONCLUSION

Finding no merit to Keadle's assigned error, we affirm the judgment of the district court.

AFFIRMED.

FREUDENBERG, J., not participating.

---

[40] *State v. Olbricht*, 294 Neb. 974, 987, 885 N.W.2d 699, 708-09 (2016), quoting *State v. Buchanan*, 210 Neb. 20, 312 N.W.2d 684 (1981).