Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
12/19/2025 08:07 AM CST

STATE OF NEBRASKA, APPELLEE, V.
JOSHUA W. KEADLE, APPELLANT.

___ N.W.3d ___

Filed December 19, 2025.    No. S-25-128.

1. **Effectiveness of Counsel: Appeal and Error.** Appellate review of a claim of ineffective assistance of counsel is a mixed question of law and fact. When reviewing a claim of ineffective assistance of counsel, an appellate court reviews the factual findings of the lower court for clear error. With regard to the questions of counsel's performance or prejudice to the defendant as part of the two-pronged test articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), an appellate court reviews such legal determinations independently of the lower court's decision.

2. **Postconviction: Constitutional Law.** Postconviction relief is a very narrow category of relief, available only to remedy prejudicial constitutional violations that render the judgment void or voidable.

3. **Effectiveness of Counsel: Proof.** In order to establish a right to postconviction relief based on a claim of ineffective assistance of counsel, the defendant has the burden, in accordance with *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), to show that counsel's performance was deficient and that counsel's deficient performance prejudiced the defense in his or her case.

4. ____: ____. To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law.

5. **Effectiveness of Counsel: Proof: Words and Phrases.** To show prejudice in a claim of ineffective assistance of counsel, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

6. **Trial: Effectiveness of Counsel: Presumptions: Appeal and Error.** In determining whether trial counsel's performance was deficient, there is a strong presumption that counsel acted reasonably.
7. **Postconviction: Appeal and Error.** In an appeal from the denial of postconviction relief, an appellate court will not consider for the first time on appeal claims that were not raised in the verified motion.

Appeal from the District Court for Gage County: Ricky A. Schreiner, Judge. Affirmed.

Benjamin H. Murray, of Murray Law, P.C., L.L.O., for appellant.

Michael T. Hilgers, Attorney General, and Melissa R. Vincent for appellee.

Funke, C.J., Cassel, Stacy, and Papik, JJ., and Riedmann, Chief Judge, and Bishop and Freeman, Judges.

Funke, C.J.

## I. INTRODUCTION

Joshua W. Keadle appeals from an order of the district court for Gage County, Nebraska, denying his motion for postconviction relief following an evidentiary hearing. Keadle's motion alleged, among other things, ineffective assistance of trial counsel, and on appeal, Keadle argues that the district court erred in finding that his two trial counsel were not ineffective in several regards. In fact, Keadle claims that one of his trial counsel has admitted to performing deficiently in a manner that prejudiced Keadle. Because Keadle's arguments are without merit or are not properly before us on appeal, we affirm the order of the district court.

## II. BACKGROUND

### 1. Trial and Direct Appeal

This is the second time that Keadle's conviction for second degree murder has come before us.[1] The following paragraphs

---

[1] See *State v. Keadle*, 311 Neb. 919, 977 N.W.2d 207 (2022).

recount only those aspects of Keadle's trial and direct appeal that specifically pertain to his arguments in the present matter.

Keadle was charged with first degree murder in connection with the disappearance of Tyler Thomas. Keadle and Thomas were students at the same college when Thomas went missing. Keadle admitted that he was with Thomas in the early morning hours of the day she disappeared. However, Keadle claimed that he left Thomas by a river after the two of them argued.

### (a) Keadle's Trial

A jury trial was held. At the trial, the State's theory was that Keadle killed Thomas and disposed of her body. The defense countered by proposing "several possible explanations" for Thomas' disappearance.[2] One explanation was that Thomas, who was intoxicated and was not wearing a coat, succumbed to hypothermia, became disoriented, fell into the river, and died.

Consistent with that explanation, the defense called Dr. Thomas Young, a forensic pathologist, as a witness to testify about hypothermia. On direct examination, Young was questioned by Keadle's lead counsel, Jeffery A. Pickens, about the circumstances where hypothermia "is a cause of death." Young explained that persons who are drunk or have Alzheimer's disease and "wander[] off" without adequate clothing "may succumb to cold exposure." Pickens then asked Young whether "in those examples," hypothermia is "typically an accident, or is it a purposeful thing." Young responded that it is "typically an accident." Young also said that people who have been exposed to "a lot of cold" typically become "delirious" or "disoriented."

Subsequently, on cross-examination, the prosecutor asked Young what he meant by "'hypothermia not being purposeful.'" Young clarified that he meant the person did not "mean[] to kill themselves" in the circumstances described. Instead,

---

[2] *Id*. at 928, 977 N.W.2d at 214.

Young said the death was "what you would call an accident."
The following exchange then ensued:

> Q. You weren't referring to someone who might take
> someone out into an area where they would have little
> chance of coming back to safety. That might be purposeful.
> That's not what you were referring to, were you?

> A. Okay. Usually, when, as a medical examiner, when I
> assign accident as a manner [of death], it basically means
> that there's an environmental cause to the death, and
> there's no evidence of intent, either other destructive or
> self-destructive intent.

> Q. So . . . you are not saying that it's not possible for
> someone to purposely take someone in a situation where
> they may never be able to get back to safety; that wasn't
> your intent. That wasn't the meaning?

> A. If . . . there was evidence of something like that,
> then you would call it a homicide.

The defense did not object to Young's testimony. Nor did
it engage in any further questioning of Young on redirect
examination.

Pickens then asked to speak with his cocounsel, Matthew
McDonald, and Keadle. However, that conversation was not
recorded, and Pickens and McDonald subsequently testified
that they could not recall what, if anything, the defense had
discussed beyond whether Keadle wanted to testify in his
own behalf.

After the conversation, the defense rested and moved to
dismiss the charge against Keadle on the ground that the State
had failed to meet its burden to prove beyond a reasonable
doubt that Thomas was dead and that her death was the result
of criminal action. The court asked the defense whether it
waived that argument when it "started putting on evidence."
The defense said it did not think so. Speaking for the defense,
Pickens "admit[ted] [he was] a little bit confused by that."
However, Pickens argued that the defense's moving to dismiss
at that time was akin to renewing a motion for a directed

verdict that had been overruled at the close of the State's case. The court overruled the motion to dismiss.

A jury instruction conference was then held. The jury instructions do not appear to be part of the record on appeal in this case. However, Pickens subsequently testified that although he could not think of any instruction that "would have in some way aided to clarify manslaughter versus murder in this circumstance," the jury was instructed on the "elements of murder."

After the jury instruction conference, the parties presented closing arguments. As is relevant here, in its closing argument, the defense argued that

> Keadle is not the cause of [Thomas'] death. You cannot hold him accountable for making a bad decision of leaving her at the river because she refused to get in [his vehicle]. That may be a bad decision on his part. But he is going to live with that the rest of his life. You cannot convict him if you are mad at him for leaving her down there. That is not a crime that he can be charged with.

After closing arguments, the jury began its deliberations. Approximately 3 hours into the deliberations, the jury requested a transcript of the "'cross from [the] State from . . . Young.'" The court responded by asking the "'exact nature of [the] difficulty'" and the "'precise testimony that can resolve it.'"[3] The jury never answered that question. On the following day, the jury found Keadle guilty of the lesser-included offense of second degree murder.

### (b) Sentencing Hearing

Subsequently, at the sentencing hearing, Pickens said he could not "help but feel that [he was] responsible" for Keadle's conviction of second degree murder. Pickens explained that the State's theory of the case was premediated murder; namely, that Keadle raped Thomas, killed her, and dragged her body to the

---

[3] See, e.g., *State v. Gutierrez*, 260 Neb. 1008, 620 N.W.2d 738 (2001).

river and threw it in. Pickens opined that "the State didn't have a very strong case" against Keadle under that theory. However, Pickens said "there was one event that made [the State's] case considerably stronger, and that was when [he] called . . . Young . . . to testify about hypothermia." Pickens specifically pointed to Young's testimony that purposely placing a person in a situation from which "'they may never be able to get back to safety'" is homicide.

Pickens faulted himself for his response to that testimony. Pickens said:

> I sat [t]here and did nothing. I didn't know what to do. I didn't know how to clean up. When my expert gets on the stand and essentially says that [Keadle] committed a homicide, there is no way I knew at that time [how] to clean that up, and the risk was I was just going to make it a hell of a lot worse.

Pickens said that it was "difficult to stand in a courtroom and admit deficient performance," but that he had no question his performance was deficient with respect to Young. Pickens also said that Young's testimony was a "turning point" in the case, as shown by the jury's subsequent request for a transcript of the State's cross-examination of Young. Pickens said, "[W]e all knew what they wanted. They wanted this portion from the examination where he says that would be a homicide read back to them." Pickens also said that in conversations with the jurors after the trial, the jurors said "[h]aving . . . Young say that was a homicide made the difference." As such, Pickens claimed that but for Young's testimony, Keadle "should have been found guilty of manslaughter or . . . acquitted."

Keadle was sentenced to a term of 71 years' to life imprisonment.

### (c) Direct Appeal

Subsequently, still represented by Pickens, Keadle filed a direct appeal. On appeal, Keadle assigned only that the evidence adduced at the trial was insufficient to establish the

corpus delicti of homicide. Finding no merit to that argument, we affirmed the judgment of the district court.[4]

## 2. Motion for Postconviction Relief

### (a) Keadle's Motion and State's Response

Within 1 year after we issued our mandate on direct appeal affirming Keadle's conviction, Keadle filed the present motion for postconviction relief. In the motion, Keadle raised multiple claims of actual innocence, prosecutorial misconduct, and ineffective assistance of trial counsel. However, the only claims from Keadle's motion that are at issue here are the claims, summarized and restated, that his two trial counsel were ineffective in failing to object to Young's testimony on cross-examination, failing to ask any further questions of Young to clarify the basis and meaning of that testimony, and failing to ask that the jury be instructed about the difference between the legal definition of "homicide" and the medical examiner's definition.

The State conceded that several of Keadle's claims of ineffective assistance of counsel required an evidentiary hearing. However, the State claimed that the record was sufficient to show that Keadle's other claims of ineffective assistance of counsel were meritless. The State similarly claimed that Keadle's claims of prosecutorial misconduct were procedurally barred.

### (b) Depositions of Pickens and McDonald

Keadle subsequently sought and obtained permission to depose Pickens and McDonald. What follows is an overview of counsels' testimony as it pertains to Keadle's claims on direct appeal. As set forth in greater detail below, those claims concern counsels' alleged failure to respond to

---

[4] See *Keadle, supra* note 1.

Young's testimony on cross-examination, their failure to move for a directed verdict at the close of the State's case, and Pickens' representation of Keadle on direct appeal. The latter two claims were not raised in Keadle's motion for postconviction relief, as described above.

Pickens and McDonald testified that the defense prepared for Young's testimony and that as of the close of direct examination, they thought Young's testimony had gone well and supported their case. They also testified that they viewed Young's subsequent testimony on cross-examination as "damaging," because when coupled with Keadle's admission that he took Thomas to the river and left her there, it would have allowed the jury to "infer" he committed homicide. However, Pickens acknowledged that Young's testimony "didn't really fit with the State's theory of prosecution." At deposition, as at Keadle's sentencing hearing, Pickens faulted himself for his performance in regard to Young's testimony, although McDonald was less certain Pickens had made a mistake.

Specifically, Pickens testified that he performed deficiently in not anticipating the question that the prosecutor asked of Young and in not avoiding the line of inquiry on direct examination that prompted that question. Pickens said that had he anticipated the prosecutor's question, he would not have called Young. Pickens also said that shortly before Young testified, Pickens decided that Young's testimony was not needed, because the issue of hypothermia could have been "argue[d] to the jury" without the testimony. However, Pickens said that he nonetheless called Young to testify because McDonald believed Young's testimony was needed to support the defense's closing arguments. At deposition, McDonald persisted in that view, claiming that the defense "needed to call [Young] because . . . hypothermia . . . was part of our defense." McDonald seemingly suggested that even knowing what Young said on cross-examination, he "still would have called him."

Pickens said that he did not "believ[e] [his performance] was deficient in any other way" except as to Young. Neither he nor McDonald could recall whether the defense discussed how to respond to Young's testimony before the defense rested. Pickens also admitted that he could not think of any objection to Young's testimony, any questions on redirect, or any way to "clean[] . . . up" Young's testimony by calling another witness or by a jury instruction. However, both Pickens and McDonald said there were risks to asking further questions of Young on redirect examination and attempting to rehabilitate him. Pickens said that with redirect, there is "always concern[] about highlighting damaging testimony" and "reinforc[ing] what the jury had already heard." McDonald testified similarly about the risks of redirect examination. McDonald also said that trying to rehabilitate Young would have been "risky," because the defense did not know what he might have said and "could have made [the situation] worse." Ultimately, Pickens said that after the defense rested and moved to dismiss, it discussed whether to "deal with" Young's testimony in closing arguments. Pickens said he believed the testimony "could be handled in argument; that this wasn't the State's theory."

As to why the defense did not move for a directed verdict at the close of the State's case, Pickens said that he does not always make such a motion. Pickens said that he "know[s] a lot of lawyers" who do and that some argue "it's malpractice not to." However, Pickens said he did not "see any point" in making a frivolous motion he knew would be overruled. McDonald testified that Pickens would have been the one to decide whether to move for a directed verdict at the close of the State's case and that he could not recall Pickens' reasoning on the issue. However, McDonald said that, like Pickens, he does not make such motions unless they are warranted under the facts and circumstances of the case.

Similarly, as to his representation of Keadle on direct appeal, Pickens testified that he routinely discussed with

clients who could best represent them on appeal. Pickens acknowledged that he raised only one issue on direct appeal and that some attorneys raise "every argument they can." However, Pickens said he believed in raising only issues that had "a chance of winning." McDonald, who was not "involved very much after the trial," said he was "sure" he and Pickens discussed with Keadle who should handle the direct appeal. However, McDonald opined that the trial counsel "know better" than other attorneys what issues to raise on direct appeal and that any claim of ineffective assistance of trial counsel could be raised on postconviction. Also, like Pickens, McDonald said he does not "believe in throwing every issue at the judges" on appeal, but instead raises only genuine issues.

### (c) District Court's Order

After an evidentiary hearing at which the depositions of Pickens and McDonald were offered and received into evidence, the district court denied Keadle's motion for postconviction relief. The court first rejected Keadle's claims of actual innocence and prosecutorial misconduct, as well as two claims of ineffective assistance of counsel that did not pertain to Young's testimony.

The court then turned to Keadle's remaining claims of ineffective assistance of trial counsel, which included his claims regarding counsels' response to Young's testimony. As to those claims, the court found that counsels' performance was not deficient. According to the court, "the evidence [was] clear" that the decisions to call Young and then not to ask further questions of him on redirect or seek clarifying jury instructions were "strategic choices made by a team of experienced trial lawyers, after thorough investigations of fact and law and extensive discussion." The court said that decisions made during homicide trials are "often complex, requiring the attorney to weigh risks versus rewards while trying to anticipate the strategies of the other party and the thought processes

of a jury," and that counsel cannot anticipate every question asked on cross-examination or witnesses' answers. As such, the court said, "[t]he fact that [Keadle] and/or his trial counsel now believe that one of their trial decisions did not pay off in the end does not equate to deficient performance."

Keadle timely appealed the order of the district court, and we moved the matter to our docket.[5]

## III. ASSIGNMENT OF ERROR

Keadle assigns that the district court erred in "denying [his] Motion for Postconviction Relief."

## IV. STANDARD OF REVIEW

[1] Appellate review of a claim of ineffective assistance of counsel is a mixed question of law and fact.[6] When reviewing a claim of ineffective assistance of counsel, an appellate court reviews the factual findings of the lower court for clear error.[7] With regard to the questions of counsel's performance or prejudice to the defendant as part of the two-pronged test articulated in *Strickland v. Washington*,[8] an appellate court reviews such legal determinations independently of the lower court's decision.[9]

## V. ANALYSIS

Keadle claims that the district court erred in overruling his motion for postconviction relief. Instead, Keadle argues that the district court should have granted the motion because his two trial counsel were ineffective in (1) failing to "do anything"[10]

---

[5] See Neb. Rev. Stat. § 24-1106(3) (Cum. Supp. 2024).

[6] *State v. Betancourt-Garcia*, 317 Neb. 174, 9 N.W.3d 426 (2024).

[7] *Id*.

[8] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[9] *Betancourt-Garcia, supra* note 6.

[10] Brief for appellant at 17.

in response to Young's testimony on cross-examination that purposely placing a person in a situation from which "they may never be able to get back to safety" is homicide, (2) failing to move for a directed verdict at the close of the State's case, and (3) representing Keadle on direct appeal. The State disagrees. The State argues that Keadle's claim regarding counsels' response to Young's testimony is without merit, because counsels' performance was not deficient and Keadle cannot show that he suffered any prejudice. As to Keadle's other claims, the State argues that those claims are not properly before the court on appeal.

[2,3] Postconviction relief is a very narrow category of relief, available only to remedy prejudicial constitutional violations that render the judgment void or voidable.[11] In order to establish a right to postconviction relief based on a claim of ineffective assistance of counsel, the defendant has the burden, in accordance with *Strickland*, to show that counsel's performance was deficient and that counsel's deficient performance prejudiced the defense in his or her case.[12]

[4,5] To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law.[13] To show prejudice in a claim of ineffective assistance of counsel, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.[14] A reasonable probability is a probability sufficient to undermine confidence in the outcome.[15] A court may examine performance and

---

[11] *State v. Davis*, 317 Neb. 59, 8 N.W.3d 247 (2024).

[12] *State v. Munoz*, 309 Neb. 285, 959 N.W.2d 806 (2021).

[13] *Betancourt-Garcia, supra* note 6.

[14] *Id*.

[15] *Id*.

prejudice in any order and need not examine both prongs if a defendant fails to demonstrate either.[16]

## 1. Response to Young's Testimony
## on Cross-Examination

Turning first to Keadle's claim that his two trial counsel were ineffective in their response to Young's testimony on cross-examination, we agree with the State that counsels' performance was not deficient. The district court found that the decisions to call Young and then not to ask further questions of him on redirect examination or to seek clarifying jury instructions were strategic choices. As courts in other jurisdictions have explained, when applying the framework set forth in *Strickland*,

> [i]nquiries into strategic or tactical decisions challenged as ineffective assistance of counsel involve both a factual and a legal component. The question of whether an attorney's actions were actually the product of a tactical or strategic decision is an issue of fact . . . . By contrast, the question of whether the strategic or tactical decision is reasonable enough to fall within the wide range of professional competence is an issue of law not one of fact . . . .[17]

Under the standard of review previously noted, we review the trial court's factual findings for clear error and its legal determinations independently of the trial court's decision.

---

[16] *Id*.

[17] *Provenzano v. Singletary*, 148 F.3d 1327, 1330 (11th Cir. 1998), *rehearing and suggestion for rehearing en banc denied* 162 F.3d 100 (11th Cir). See, also, *United States v. Cockrell*, 720 F.2d 1423 (5th Cir. 1983), *rehearing denied* 724 F.2d 976 (5th Cir.), *cert. denied* 467 U.S. 1251, 104 S. Ct. 3534, 82 L. Ed. 2d 839 (1984); *Edwards v. Lamarque*, 475 F.3d 1121 (9th Cir. 2007), *cert. denied* 552 U.S. 1009, 128 S. Ct. 532, 169 L. Ed. 2d 371; *Sallahdin v. Mullin*, 380 F.3d 1242 (10th Cir. 2004); *Floyd v. State*, 159 So. 3d 987 (Fla. App. 2015); *State v. Hernandez*, 227 N.C. App. 601, 742 S.E.2d 825 (2013).

We find no clear error in the district court's factual finding that the actions of trial counsel of which Keadle complains were the product of strategic decisions. The "clearly erroneous" standard of review is a deferential one,[18] under which an appellate court will overturn the trial court's factual findings only if it has a definite and firm conviction that a mistake has been made.[19] We have no such conviction here.

Relying primarily on Pickens' statement at the sentencing hearing that he "sat [t]here and did nothing" when Young made the allegedly problematic statement on cross-examination, Keadle argued before this court that Pickens "froze," with the apparent implication that Pickens' actions were not the product of strategic choices. However, we understand Pickens' statement at sentencing to have concerned his immediate reaction to Young's testimony on cross-examination. Pickens' subsequent testimony at the deposition provided a fuller picture of his actions over the course of the entire trial. Specifically, Pickens testified that "[t]o this day," he did not know how Young's testimony could have been "clean[ed] up" by some of the means proposed by Keadle. In addition, both Pickens and McDonald testified that there were risks to asking further questions of Young on redirect examination and attempting to rehabilitate him. Pickens also testified that after the defense rested and moved to dismiss, it discussed dealing with Young's testimony in closing argument, and that he believed "it could be handled in argument."

[6] Our review of whether counsels' strategic decisions were reasonable enough to fall within the wide range of professional competence is less deferential but leads to a similar conclusion. This is because in determining whether trial counsel's performance was deficient, there is a strong presumption

---

[18] See *Rice v. Poppe*, 302 Neb. 643, 924 N.W.2d 344 (2019).

[19] See, e.g., *State v. Toney*, 243 Neb. 237, 498 N.W.2d 544 (1993), *abrogated on other grounds, State v. Matteson*, 313 Neb. 435, 985 N.W.2d 1 (2023).

that counsel acted reasonably.[20] The defendant has the burden of overcoming that presumption.[21] Keadle failed to meet that burden. Keadle's primary argument on appeal is that counsels' "failure . . . to do anything" in response to Young's testimony "was not objectively reasonable."[22] Keadle also argued before this court that counsel "ha[d] to do something to rehabilitate" Young. However, the record before us shows that counsel did in fact discuss and decide to address Young's testimony in its closing arguments. In fact, in closing, the defense actually argued that Keadle could not be convicted for "leaving [Thomas] down there. That is not a crime that he can be charged with." The record also shows that both Pickens and McDonald were concerned that asking further questions of Young on redirect examination and attempting to rehabilitate him risked drawing attention to the allegedly problematic testimony and opened the door to further testimony by Young for which the defense was unprepared.

As to Pickens' own belief that his performance was deficient, counsel for Keadle conceded in arguments before this court that he does not view that admission to be "binding" on the court. We agree. A contrary approach would be inconsistent with the standard of review set forth above, which calls for an appellate court to independently review legal determinations.[23] And a rule that would permit lawyers to bind the court by impugning their own professional conduct, at least outside

---

[20] *State v. Anders*, 311 Neb. 958, 977 N.W.2d 234 (2022). See, also, *Strickland, supra* note 8, 466 U.S. at 689 ("a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance").

[21] See, e.g., *State v. Alfredson*, 287 Neb. 477, 842 N.W.2d 815 (2014); *State v. Iromuanya*, 282 Neb. 798, 806 N.W.2d 404 (2011); *State v. Williams*, 259 Neb. 234, 609 N.W.2d 313 (2000).

[22] Brief for appellant at 17.

[23] See, e.g., *Betancourt-Garcia, supra* note 6. Cf. *State v. Blocher*, 313 Neb. 699, 986 N.W.2d 275 (2023) (parties have no right to stipulate as to questions of law and such stipulation, if made, will be disregarded).

disciplinary proceedings, could perversely incentivize lawyers to "confess" deficient performance.[24]

## 2. Remaining Claims

[7] Keadle also argues that his two trial counsel were ineffective in failing to move for a directed verdict at the close of the State's case and in representing him on direct appeal after admitting deficient performance. However, as the State observes, neither of those claims were raised in Keadle's motion for postconviction relief. As such, those claims are not properly before us on appeal. In an appeal from the denial of postconviction relief, an appellate court will not consider for the first time on appeal claims that were not raised in the verified motion.[25]

## VI. CONCLUSION

Keadle's claims of ineffective assistance of trial counsel either are without merit or are not properly before this court on appeal. As such, we affirm the order of the district court.

Affirmed.

Freudenberg and Bergevin, JJ., not participating.

---

[24] Cf. *Matter of Lozada*, 19 I. & N. Dec. 637 (B.I.A. 1988) (to claim ineffective assistance of counsel in immigration proceeding, alien must file complaint against attorney with appropriate disciplinary authorities or explain why no such complaint was filed).

[25] *State v. Goynes*, 318 Neb. 413, 16 N.W.3d 373 (2025).